Pamela Marie RICHARDSON and Earl Simmons, Plaintiffs,

v.

RESTAURANT MARKETING ASSOCIATES, INC., Defendant.

No. C–77–0768 MHP.

United States District Court, N. D. California.

Nov. 17, 1981.

As Corrected Nov. 30, 1981.

Alberta M. Blumin, Dayley & Blumin, Guy T. Saperstein, Farnsworth, Saperstein & Brand, Oakland, Cal., for plaintiffs.

Robert T. Fries, Steinhart, Falconer & Morgenstein, San Francisco, Cal., for defendant.

Robert T. Murphy, Murphy & Storey, Phoenix, Ariz., for Restaurant Marketing Associates, third party plaintiff.

## MEMORANDUM OPINION

PATEL, District Judge.

This case concerns race discrimination in employment, and was brought under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. After a hearing on liability, the court requested briefing on several issues relating to damages. A short opinion on those questions was issued, followed by the trial of the damages issues, and briefing on a motion for attorneys' fees.

Part A: *Liability*

From the hearing on liability, October 28 to 31, 1980, the court made the following findings of fact and conclusions of law.

*Findings of Fact*

1. This suit was instituted on April 14, 1977 by Pamela Marie Richardson and Earl Simmons against Restaurant Marketing Associates, Inc. (hereinafter "RMA") pursuant to Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1866.

2. Plaintiff Richardson is a white woman who alleges that she was fired by defendant in retaliation for filing a charge of racial discrimination against it with the United States Equal Opportunity Commission.

3. Plaintiff Earl Simmons is a black man who alleges he was fired by defendant and subsequently denied rehire because of his race.

4. Defendant RMA is a corporation organized pursuant to the laws of the State of Pennsylvania and is engaged in the business of managing restaurants, cafeterias and delicatessens.

5. Defendant is an employer within the meaning of § 701(b) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

6. A. Defendant managed the Bank Exchange Restaurant in San Francisco, California from approximately March 31, 1975 through October 15, 1976.

B. Immediately prior to defendant RMA, another company, Szabo Foods, managed the Bank Exchange Restaurant.

C. For a short time immediately preceding March 31, 1975, during a transition period from Szabo Foods management to RMA management, defendant's corporate vice-presidents, Robert Wright and Diane Gallagher, and defendant's new general manager of the Bank Exchange, Bill Brooks, were present at the Bank Exchange.

7. Plaintiff Earl Simmons, at the time defendant RMA took over the management of the Bank Exchange Restaurant, was functioning as the manager of the delicatessen section. The delicatessen was patronized by many white women who worked in the area. Plaintiff Simmons supervised two employees, one white woman and one black woman.

8. A. When general manager Bill Brooks arrived at the Bank Exchange, plaintiff Pamela Richardson, assistant manager of the Bank Exchange, Susan Betz (Foley) and the chef, Everett James Marshall, heard Mr. Brooks frequently refer to blacks as "niggers". Brooks admitted that he used the term "nigger" and that vice-president Robert Wright as well as RMA regional manager, Michael Issip also used the term "nigger" when referring to black people. Susan Foley also heard vice-president Wright and regional manager Issip use the term "nigger" on the premises of the Bank Exchange Restaurant.

B. Assistant manager Susan Betz Foley was told by corporate vice-president Diane Gallagher that she would prefer it if blacks were not hired at the Bank Exchange.

C. Shortly after Bill Brooks' arrival at the Bank Exchange, Brooks told chef Everett James Marshall that he was going to get rid of some of the "undesirables" and that plaintiff Earl Simmons was going to be one of the first to go.

D. Prior to firing Earl Simmons, Bill Brooks stood and watched Simmons working for long periods each day. Brooks would not allow plaintiff Simmons to take his regular breaks and would hound plaintiff by snapping his fingers and clapping his hands in Simmons' face. Brooks was not observed "communicating" with any other employees in this fashion.

E. Bill Brooks informed plaintiff Pamela Richardson that he was "outraged" at what he termed plaintiff Simmons' "flirtatious" attitude with white women and Brooks told Pamela Richardson that plaintiff Simmons "did not know his place."

F. Prior to Earl Simmons, Bill Brooks had not worked with any black person who held a managerial position.

9. On April 2, 1975, a few days after defendant began managing the Bank Exchange Restaurant, plaintiff Simmons was ill but appeared for work at his regular hour in order to unlock the delicatessen so that the other two delicatessen employees who reported to work after him would be able to get into the delicatessen. Plaintiff Simmons waited for the chef to arrive. Plaintiff informed the chef upon his arrival that he was ill and then plaintiff went home.

10. On April 2, 1975, plaintiff Simmons was terminated by defendant RMA. He was replaced by a white man.

11. Defendant's stated reasons for plaintiff Simmons' April 2, 1975 termination (given by defendant's general manager Bill Brooks and recorded on defendant's "Employee Record Card" personnel form which terminated plaintiff effective April 2) are that plaintiff Simmons left work suddenly one morning saying that he was ill, that he did not wait for a replacement and that he then did not call the Bank Exchange for two and one-half days. These reasons are pretexts for intentional racial discrimination in that:

A. As of April 2, 1975 (the effective date of plaintiff's termination, and the date the Employee Record Card was completed stating the reasons for plaintiff's termination), it was impossible that two and one-half days had elapsed since plaintiff had left work in the morning because plaintiff Simmons' time card showed that April 2 was the very morning that he had left work early (ill); and

B. During defendant's management of the Bank Exchange Restaurant white em-

ployees had left work suddenly saying they were ill, without obtaining replacements, and were neither fired nor disciplined.

12. In mid-February, 1976, approximately ten and one-half months after plaintiff Simmons was terminated, he ran into defendant's general manager of the Bank Exchange Restaurant, Mr. Brooks, at a bar and inquired whether he could obtain another job at defendant's restaurant. Mr. Brooks informed plaintiff Simmons that an opening was coming up and that he should come in to see the chef about it.

13. The following day Mr. Brooks commented to plaintiff Richardson that he had run into "the nigger who used to work down in the delicatessen" and informed plaintiff Richardson with some derisiveness that plaintiff Simmons had asked for his job back.

14. A. Shortly after that plaintiff Simmons went to the Bank Exchange Restaurant to apply for re-hire.

B. Susan Betz (Foley) was surprised to see plaintiff Simmons at the Bank Exchange again, and to learn from Simmons that Brooks had told him to come in for a job, because, according to Susan Betz (Foley) Brooks was "a bit of a Bigot."

C. While at the Bank Exchange plaintiff Simmons left his phone number with the then executive chef for RMA, Rolf Paul.

D. Rolf Paul took plaintiff Simmons' phone number because you can "never tell" when an opening might come up in the future. Rolf Paul remembered that plaintiff Simmons had specifically asked about a cook's job.

E. After plaintiff Simmons left the Bank Exchange, Rolf Paul told plaintiff Richardson that if she hired plaintiff Simmons he, Rolf Paul, would lose his job.

F. Since plaintiff Simmons had been fired by RMA in April of 1975, there had not been more than one black working at a time in the delicatessen.

G. Rolf Paul had told plaintiff Richardson at some time prior to plaintiff Simmons' reapplying for work, that if you have more than one black person working together in a small area (he was referring to the Bank Exchange delicatessen) "they gang up on you."

15. On March 2, 1976 an opening came up at the Bank Exchange for a cook's job and on or about March 4, 1976 an opening came up in the delicatessen, when a woman deli worker took a pregnancy leave of absence. Plaintiff Simmons was not called about either position and was not hired.

16. Plaintiff was denied re-hire by defendant at the Bank Exchange Restaurant because of his race.

17. During defendant RMA's management of the Bank Exchange Restaurant plaintiff Richardson was employed as the Director of Dining Room Services/Head Waitress. During her employment in that capacity plaintiff Richardson was privy to defendant's general manager's (Bill Brooks) frequent use of racial slurs and derogatory comments about black people. Shortly after RMA personnel appeared at the Bank Exchange plaintiff Richardson was told by assistant manager Susan Betz (Foley) that Brooks would not like it if plaintiff hired black waitresses and in July, 1975 plaintiff was not allowed to hire a black woman as hostess (whom plaintiff Richardson had selected as the most qualified applicant) because of the woman's race. In Spring, 1975 when plaintiff Richardson inquired of vice-president Diane Gallagher regarding which RMA forms she should use to record the race and sex of Bank Exchange employees, which plaintiff Richardson believed were necessary for reports required by federal law, plaintiff was told by vice-president Gallagher not to worry about it, "we don't do those." Defendant has admitted that it did not file EEO–1 reports until approximately one year after this lawsuit was instituted (this suit was instituted in April, 1977). At one point plaintiff Richardson was told by Bill Brooks to fire a white waitress whom he saw talking in the lobby of the Bank Exchange with a black man.

18. The work atmosphere at the Bank Exchange Restaurant was so infested with

racial discrimination that defendant deprived plaintiff Richardson of the benefits of a work atmosphere conducive to inter-racial harmony and inter-racial associations.

19. As a supervisor for RMA in charge of hiring dining room employees including waitresses and hostesses, plaintiff Richardson's job security depended on her breaking the laws against equal employment opportunity in that she was not permitted to hire blacks.

20. On March 2, 1976 plaintiff Richardson informed her supervisor Susan Betz (Foley) that she was going to go the following day to the United States Equal Employment Opportunity Commission to file a charge of racial discrimination against defendant. Assistant Manager Foley informed general manager Bill Brooks about plaintiff Richardson's intentions either that same day, March 2, or the following day, March 3.

21. Plaintiff Richardson was terminated by defendant, effective March 3, 1976.

22. On March 3 plaintiff Richardson had decided to resign her employment at the Bank Exchange effective March 5, 1976, because she reasonably found her work conditions intolerable in that she could no longer in good conscience work in an atmosphere so infected with racism and because she believed she would either be fired shortly or otherwise be forced out of her job. On March 4, plaintiff arrived at work for her regular shift and was handed her written termination notice effective March 3, 1976. After plaintiff had received her written discharge notice, she went to Mr. Brook's office at the Bank Exchange and handed Mr. Brooks' secretary her resignation letter (effective March 5, 1976). Mr. Brooks was not yet at the Bank Exchange that morning.

23. Defendant's stated reasons for terminating plaintiff Richardson were that she had removed property belonging to RMA from the Bank Exchange, that she had failed to provide a doctor's certificate of sickness after three requests, that she had reported to work late after several warnings and that she had failed to show up for work for a regular shift without valid reasons. The foregoing are merely pretextual reasons for this plaintiff's discharge in that:

(1) The only RMA property plaintiff had ever removed from the Bank Exchange was the employment application of the black hostess whom she had not been permitted to hire because of the applicant's race and plaintiff Richardson had told her supervisor in October of 1975 that she had taken the rejected applicant's application home with her;

(2) Plaintiff had last missed work due to illness in January, 1976 and Brooks had asked her once in January for a doctor's certificate and had been told by plaintiff Richardson that she would supply it as soon as she next went to her doctor. Brooks did not ask again about the certificate.

(3) Plaintiff had been late for work a few times in September of 1975 and according to both plaintiff Richardson and Susan Foley plaintiff's "lateness" was not a serious problem.

(4) The only reason plaintiff had given RMA for her intention to miss her regular shift on March 3 was to go to the EEOC to file the racial discrimination charge against defendant.

24. Plaintiff Richardson's employment at the Bank Exchange ended by her actual discharge in retaliation for filing an EEOC charge.

*Conclusions of Law*

1. This court has jurisdiction for plaintiff Simmons' discharge case pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981, and of plaintiff Simmons' rehire case pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981.

2. The court has jurisdiction of plaintiff Richardson's discharge case pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

3. The court has jurisdiction of plaintiff Richardson's claim that she was denied the benefits of a work environment conducive

to inter-racial harmony and association pursuant to Title VII and 42 U.S.C. § 1981. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 113 n.26, 99 S.Ct. 1601, 1615, 60 L.Ed.2d 66 (1979); *Des Vergnes v. Seekonk Water District*, 601 F.2d 9, 14 (1st Cir. 1979); *Waters v. Heublein, Inc.*, 547 F.2d 466 (9th Cir. 1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977); *Bartelson v. Dean Witter & Co.*, 86 F.R.D. 657, 665 (E.D.Pa.1980); *National Organization for Women v. Sperry Rand Corp*, 457 F.Supp. 1338 (D.Conn.1978).

4. A substantial factor in defendant's decision to terminate plaintiff Simmons' was his race. *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980); *Williams v. Anderson*, 562 F.2d 1081, 1094 (8th Cir. 1977) (§ 1983); *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344, 349, 350 (7th Cir. 1970) (§ 1982). Defendant's termination of plaintiff Simmons was a violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

5. A substantial factor in defendant's decision to not rehire plaintiff Simmons was his race. *Whiting v. Jackson State University*; *King v. Laborers International Union of North America, Local No. 818*, 443 F.2d 273, 278, 279 (6th Cir. 1971); *Slack v. Havens*, 8 Empl. Prac. Dec. ¶ 9492, page 5219 (S.D.Cal.1973), aff'd, 522 F.2d 1091 (9th Cir. 1975). *Gay v. Waiters' and Dairy Lunchmen's Union, Local 30*, 489 F.Supp. 282 (N.D.Cal.1980), is distinguishable in that there was no practice of maintaining applications in that case as there was here. Defendant's refusal to rehire plaintiff Simmons was a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

6. Plaintiff Richardson was fired in retaliation for filing an EEOC charge against defendant. *Hicks v. ABT Associates, Inc.*, 572 F.2d 960, 969 (3rd Cir. 1978); *Macey v. World Airways, Inc.*, 14 Fair Empl. Prac. Cas. 1426 (N.D.Cal.1977). A retaliatory discharge of this type is a violation not only of Title VII but also of the Civil Rights Act of 1866, 42 U.S.C. § 1981. *Winston v. Lear-*

*Siegler, Inc.*, 558 F.2d 1266 (6th Cir. 1977); *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 312 (2nd Cir.), *modified*, 520 F.2d 409 (2nd Cir. 1975); *Crawford v. Roadway Express, Inc.*, 485 F.Supp. 914, 922 (W.D.La. 1980).

7. Defendant deprived plaintiff Richardson of a work environment conducive to inter-racial harmony and association, and such deprivation constituted a violation of Title VII and 42 U.S.C. § 1981. *Gladstone, Realtors v. Village of Bellwood*; *Des Vergnes v. Seekonk Water District*; *Waters v. Heublien, Inc.*; *Bartelson v. Dean Witter & Co.*; *National Organization for Women v. Sperry Rand Corp.* Such illegal deprivation included the fact that plaintiff Richardson's job security required her to break equal employment laws.

Part B: *Legal Issues re: Damages*

At a hearing held following the conclusion of trial on the liability phase of this employment discrimination case, the court requested the parties to brief certain disputed questions of law regarding the proper scope of damages to be awarded. The court having considered the briefs filed by both parties in response to that request, issued the following memorandum for the guidance of the parties in preparing for trial on the damages phase of the case.

I

## LENGTH OF BACK PAY PERIOD FOR PLAINTIFF RICHARDSON

The evidence at the trial on liability established that by March 3, 1976, plaintiff Richardson had decided to resign from her job at defendant's restaurant. On that date, having previously notified her supervisor of her intentions, she took the day off and went to the E.E.O.C. office to file a charge. On March 4, plaintiff arrived at work at her normal time with a letter of resignation in hand, announcing her intent to leave her job as of the end of her shift on March 5. However, before she could hand in her letter of resignation, she was given a termination notice effective March 3. Defendant argues that, because plaintiff Rich-

ardson had intended to resign, effective two days after she was fired, she should only be entitled to two days back pay as compensation for her retaliatory discharge. This argument is based on a valid premise: an employee should not be able to claim back pay for a time period when he or she would not have been on the job in any event, for a reason unrelated to the illegal conduct of the employer.[1] However, when the premise is stated in this fashion, it becomes self-evident that it is inapplicable in this case.

The evidence at trial showed, and this court finds, that plaintiff Richardson decided to resign for two reasons, both of which were directly related to defendant's violations of Title VII.[2] First, as she stated in her EEOC charge, plaintiff intended to resign because "the working conditions at my jobsite are so infected with racism that I can no longer work there in good conscience." Second, plaintiff testified that she also decided to resign because she suspected—quite correctly, as it turned out—that she would be fired for filing the EEOC charge, and, like most working people she preferred to resign rather than suffer the stigma of being fired. [Richardson RT 10/28/80 at 53–54.] As it happened, of course, defendant acted so quickly to fulfill plaintiff's worst expectations that her attempted resignation came too late to be effective.

Thus, plaintiff's resignation, had it occurred, would not have been an absence unrelated to defendant's illegal conduct. Cases holding back pay inappropriate where an employee would have left the job due to health, retirement, plant closing, or voluntary transfer should not be controlling in a case where there is an intimate causal relationship between defendant's discriminatory conduct and the affected employee's decision to leave the job. *See Helbling v. Unclaimed Salvage & Freight Co.,* 489 F.Supp. 956, 963 (E.D.Pa.1980) (where plaintiff left job due to disagreement with the very man who had been hired for the position that plaintiff had been discriminatorily denied, plaintiff's departure did not cut off back pay period); *DiSalvo v. Chamber of Commerce,* 416 F.Supp. 844, 854–55 (W.D.Mo.1976), *aff'd, and modified on other grounds,* 568 F.2d 593 (8th Cir. 1978) (back pay period did not terminate when plaintiff moved outside geographical area, because move would not have occurred absent discrimination).

Once there has been a finding of unlawful discrimination, back pay should not be denied for a reason that, if applied generally, would frustrate Title VII's purpose of eradicating discrimination and making whole those who suffer because of it. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975); *Sias v. City Demonstration Agency,* 588 F.2d 692, 696 (9th Cir. 1978). If defendant's argument is accepted, then any employer that illegally fires an employee may escape back pay liability if it can show that other illegal activity prior to the discharge had already prompted the employee to decide to resign. Such a result would be entirely contrary to the intent and purpose of Title VII.

---

1. *See Hodgson v. Ideal Corrugated Box Co.,* 10 F.E.P. Cas. 744, 752–53 (N.D.W.Va.1974) (age discrimination action; back pay terminated upon death or retirement); *cf., e.g. Davis v. Board of School Comm'rs of Mobile Co.,* 600 F.2d 470, 474 (5th Cir. 1979) (where employee would not have been hired or received promotion even absent discrimination, back pay properly denied). Certainly, in the absence of persuasive evidence that plaintiffs would have been able to transfer to other RMA-managed facilities after its San Francisco operation closed, and would have been willing to relocate for that purpose, this court will not award back pay for the period after RMA ceased to operate in San Francisco. *See Helbling v. Unclaimed Salvage & Freight Co.,* 489 F.Supp. 956, 963

(E.D.Pa.1980) (by implication) (closing of local branch at which plaintiff was employed terminated back pay period).

2. Some of defendant's arguments appear to rest on the assertion that plaintiff Richardson is being inconsistent in relying on *both* of these reasons to explain her decision to resign. This argument is unrealistic. Human beings often take an action because of the confluence of two reasons, each of which plays a substantial part in the decision. The two reasons given by plaintiff Richardson are not at all inconsistent, and this court finds it entirely believable that she relied on both of them.

Defendant's arguments that plaintiff has not met the requirements for proving a "constructive discharge" are inapposite. Where, as here, the employee was illegally fired before she had a chance to carry out her decision to resign, the reason for the intent to resign bears only on the amount of damages and not, as in a true "constructive discharge" case, on the existence of liability. Thus, the causal relationship between the employer's illegal conduct and the employee's intended resignation need not meet the standards imposed in "constructive discharge" cases. Neither *Helbling v. Unclaimed Salvage*, 489 F.Supp. at 963, nor *DiSalvo v. Chamber of Commerce*, 416 F.Supp. at 854–55, applied a constructive discharge standard in evaluating the relationship between the defendant's discriminatory conduct and the plaintiff's decision to leave work or leave the geographical area. To do so would frustrate the purpose of Title VII, by limiting the remedy awarded to a plaintiff who has succeeded in establishing defendant's unlawful conduct, and "rewarding" prior illegal conduct by the same defendant.

 The burden of showing that an otherwise appropriate back pay award should be limited in some way is on the defendant. *DiSalvo v. Chamber of Commerce*, 568 F.2d 593, 598 (8th Cir. 1978); *cf. Sias*, 588 F.2d at 696–97 (burden on defendant to show failure to mitigate). Defendant's own actions proved that plaintiff's fear of retaliatory discharge was entirely justified, and the evidence at trial amply supported plaintiff's claim that the racist atmosphere at defendant's facility ultimately became unbearable to her. Therefore, defendant has not met its burden of showing that plaintiff Richardson should not be awarded full back pay from the date of her retaliatory discharge up until the date defendant ceased to operate in San Francisco, less, of course, any reduction for money actually earned or a demonstrated failure to mitigate under the standard set forth in the *Sias* case, 588 F.2d at 696–97.

## II

## COMPENSATORY DAMAGES UNDER 42 U.S.C. § 1981

 Defendant argues at length in its brief that plaintiff Richardson is not entitled to back pay as a remedy for defendant's deprivation of her right to work in an atmosphere free from blatant race discrimination. Because plaintiff Richardson is entitled to back pay in any event due to her retaliatory discharge, the court need not reach this issue. Rather, the issue is whether plaintiff Richardson's claim for deprivation of a discrimination-free work environment entitles her to compensatory damages. The court also need not reach the issue of whether such compensatory damages are available under Title VII, because plaintiff's action was brought under 42 U.S.C. § 1981 as well, and it is well settled that general compensatory damages are available under that statute. *Johnson v. Railway Express*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975); *National Org. for Women v. Sperry Rand Corp.*, 457 F.Supp. 1338, 1347–48 (D.Conn.1978); *cf. Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, at 552–53 (9th Cir. 1980) (compensatory damages for humiliation and distress properly awarded in action under 42 U.S.C. § 1982); *Donovan v. Reinbold*, 433 F.2d 738, 743 (9th Cir. 1970) (compensatory damages for emotional distress properly awarded in action under 42 U.S.C. § 1983 for loss of job). Thus, plaintiff Richardson may present evidence during the damage phase of the trial as to her mental or emotional distress or humiliation, if any, caused by the racially discriminatory atmosphere at her workplace. In addition, plaintiff Simmons may also present similar evidence in relation to the § 1981 claims on which he has prevailed.

## III

## "INFLATION FACTOR"

Plaintiffs have requested this court to augment any back pay award they receive by interest in the amount of an inflation factor calculated according to the percent-

age increase in the Consumer Price Index. (This would, of course, be in addition to any adjustment that will be made to the amount of back pay if plaintiffs produce sufficient evidence as to raises they would have received during the back pay period.) Plaintiffs have criticized as inadequate the solution to the interest/inflation problem recently adopted in a Title VII case by another Judge of this court. *See EEOC v. Pacific Press Pub. Ass'n.*, 482 F.Supp. 1291, 1319–20 (N.D.Cal.1979) (Renfrew, J.) (interest, rather than inflation factor, is appropriately applied to Title VII awards; however, effect of inflation may be mitigated by use of Internal Revenue Service sliding interest scale, or "adjusted prime rate," rather than flat six or seven percent interest rate). Judge Renfrew's *Pacific Press* opinion explicitly rejected the alternative formula urged by plaintiffs here, based on the Consumer Price Index, and this court is not persuaded to adopt that formula.

■ In light, however, of the continued increases in the rate of inflation and rapid fluctuation of the prime rate in recent years, the court finds that the Internal Revenue Service figures used in *Pacific Press*, which are not adjusted on a regular annual basis, do not fully and accurately reflect current economic changes. Therefore, interest on any award in this case shall be calculated from the end of each calendar quarter, on the amount then due and owing, at 90% of the average prime rate for the year in which the calendar quarter occurs. These average prime rate figures, as obtained from the Federal Reserve Bank, appear in the table in the margin.[3] Interest for periods during calendar year 1981 shall be at 90% of the average prime rate for January, 1981, such figure to be obtained by the parties from the Federal Reserve Bank.

Part C: *Damages Calculations*

The hearing on damages was held on May 26 and 27, 1981. Ms. Richardson is entitled to back pay under Title VII for a retaliatory discharge. Mr. Simmons is entitled to back pay under § 1981 for discharge where race is a substantial factor. The court also finds both plaintiffs entitled to compensatory damages under § 1981.

Neither Ms. Richardson nor Mr. Simmons would have transferred to another RMA facility, therefore the cut-off date for a back pay award is October 15, 1976, when RMA ceased its San Francisco operations. Plaintiffs are entitled to the amount that RMA would have contributed to the union Health & Welfare fund. *See Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 263 (5th Cir. 1974), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Failure by plaintiffs to buy replacement coverage was due to an inability to afford such coverage rather than a lack of desire for it.

■ Whether or not to deduct unemployment compensation received from a back pay award is within the discretion of the trial court. *See Naton v. Bank of California*, 649 F.2d 691, 699, 700 (9th Cir. 1981). Both plaintiffs made adequate mitigation efforts, so the court declines to deduct the unemployment benefits. To do so would result in a windfall to the employer. *Equal Employment Opportunity Commission v. Sandia Corp.*, 639 F.2d 600, 626 (10th Cir. 1980). Actual wages earned will, of course, be deducted.

■ Using the figures submitted by the parties in their Stipulation of Facts of May 29, 1981, and the interest figures as set out in Part B above, the total back pay awards come to $12,041.74 for Ms. Richardson, and $29,233.39 for Mr. Simmons, or a total of $41,275.13.

In addition to the back pay awards, plaintiffs are also entitled to compensatory damages on their § 1981 claims. The court finds that $10,000.00 for Ms. Richardson, and $10,000.00 for Mr. Simmons, are appropriate awards.

**3.** Average Annual Prime Rates, 1975–1980

| Year | Average Prime Rate |
|------|--------------------|
| 1975 | 7.86% |
| 1976 | 6.84% |
| 1977 | 6.83% |
| 1978 | 9.06% |
| 1979 | 12.67% |
| 1980 | 15.27% |

**Part D:** *Attorneys' Fees and Costs*

"The allowance of reasonable fees in civil rights cases is an important feature of the enforcement provisions of [Title VII]." *Schaeffer v. San Diego Yellow Cabs, Inc.,* 462 F.2d 1002, 1008 (9th Cir. 1972). The purpose of awarding attorneys' fees is not to serve as an additional sanction against defendants, but to encourage representation of the public interest advanced by Title VII plaintiffs of an equal caliber with the protection of private interests. *See Copeland v. Marshall,* 641 F.2d 880, 890 (D.C.Cir. 1980) (*en banc*); *Lockheed Minority Solidarity Coalition v. Lockheed Missiles and Space Co.,* 406 F.Supp. 828, 830 (N.D.Cal.1976); *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 682 (N.D.Cal.1974), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

▌ The determination of a reasonable fee is accomplished by consideration of the twelve factors enunciated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), in the lodestar and multiplier format developed by the Third Circuit, *Lindy Bros. Builders Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3rd Cir. 1973) (*Lindy I*), 540 F.2d 102 (1976) (*Lindy II*). *See Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir. 1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976); *Brandenburger v. Thompson,* 494 F.2d 885, 890 n.7 (9th Cir. 1974); *Stanford Daily v. Zurcher,* 64 F.R.D. at 682. In such a calculation, the lodestar amount is determined by multiplying the hours reasonably expended times a reasonable rate. The reasonableness of the hours and the rate is decided upon by considering twelve factors:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesireability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild,* 526 F.2d at 70. Only those factors actually applicable to the individual case need be considered. *Keith v. Volpe,* 86 F.R.D. 565, 573 (C.D.Cal.1980).

Once the lodestar amount is calculated, the court has the discretion to increase or decrease that figure by use of a multiplier. The factors most commonly considered are the contingent nature of success, and the quality of representation where it evidences "a degree of skill above or below that expected for lawyers of the caliber reflected in the hourly rates," *Lindy II,* 540 F.2d at 118. *Lindy I,* 487 F.2d at 168. Two other factors which may be considered are the delay between the rendition of services and the receipt of an award, and inflation where historic hourly rates are used. *Keith v. Volpe,* 86 F.R.D. at 577.

Plaintiffs Richardson and Simmons were represented in this case by two attorneys, Alberta Blumin and Melvin Dayley, who also employed a law clerk, Kathleen O'Connor. The bulk of the work performed was done by Ms. Blumin. In determining the time and labor required, the court has been aware that under Ninth Circuit case law, fees should only be awarded for time expended on those issues on which the plaintiffs prevailed. *Saunders v. Claytor,* 629 F.2d 596, 599 (9th Cir. 1980). Therefore, fees are not allowed for time spent on the motion for a temporary restraining order, the request for punitive damages, the issue of transferability to another location, and class action issues. Also, time spent on the first three sets of interrogatories propounded by plaintiffs, the related motions to compel, and the handling of documents received in response thereto[4] has been halved in

---

4. Time spent by Ms. O'Connor on employee record cards after the first organization of such cards is not awarded pursuant to this motion,

recognition of the fact that much of that work related only to the class allegations. Defendants argue that no fees should be awarded for time spent on issues relating to third party defendant Pyramid, but considering that the entry of that party into the action put plaintiffs in the position of fighting new issues and thus altered their case, such hours are allowed.[5] Ms. Blumin's hours were then reduced by 15% to reflect the court's determination that, due perhaps to a combination of inexperience and unnecessary preparation, the hours expended on various tasks seemed excessive.[6] Any further reduction in the amount of hours is deemed inappropriate. Defendants contested this action strenuously over five years. They chose to have as one of their attorneys Mr. Murphy, who was not versed in Title VII but nonetheless put his oar in, multiplying the litigation. "The [defendant] cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *Copeland v. Marshall*, 641 F.2d at 904.

The hours expended by the lawclerk, Ms. O'Connor, are included as part of the attorneys' fees calculation, rather than as a cost. Those courts that have considered law clerk or paralegal time have differed on whether it should be compensated as billed or at cost, and whether it should be a cost or part of attorneys' fees and thus subject to the multiplier. *See, e.g., Thornberry v. Delta Air Lines, Inc.*, 25 Empl.Prac.Dec. ¶ 31,496, page 18, 988 (N.D.Cal.1981) (wages only); *In re Equity Funding Corp. of America Securities Litigation*, 438 F.Supp. 1303, 1330 (C.D.Cal.1977) (billing rate but no multiplier); *In re Gypsum Cases*, 386 F.Supp. 959, 967 (N.D.Cal.1974), *aff'd, In re Gypsum Antitrust Cases*, 565 F.2d 1123 (9th Cir. 1977). It is this court's view that to reimburse wages only inadequately compensates be-

cause it does not include normal overhead expenses, so a reasonable billing rate is preferable. This court is also persuaded that the use of paralegals or law clerks is cost efficient and should be encouraged, therefore their time should be included in the lodestar. The Ninth Circuit has apparently approved the inclusion of such charges as part of the attorneys' fees. *See Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1210 n. 19 (9th Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). *Accord, Keith v. Volpe*, 86 F.R.D. at 576; *Knutson v. Daily Review*, 479 F.Supp. 1263, 1272 n.16 (N.D.Cal.1979).

In assigning an hourly rate to the hours allowed plaintiffs' attorneys, the court has considered several of the *Johnson* factors. There were at least two novel questions of law addressed in this action. The first was the ability to recover under § 1981 for a white person working in an atmosphere not conducive to inter-racial harmony. The second was the inflation factor developed for calculating the back pay award. The work of plaintiffs' counsel was of great assistance to the court in deciding these issues. The case took a great deal of time over five years, undoubtedly precluding other employment. The experience and ability of the attorneys was also taken into account. Ms. Blumin was a relatively new and inexperienced attorney when the case began (member of the California bar 1975), but she had assisted in Title VII litigation as a law clerk and continued to grow in expertise in that field as this case progressed. Mr. Dayley is a more senior attorney with more experience in the area, and his rates reflect that difference. Since Dayley & Blumin take all Title VII cases on a contingency basis, no "customary" fee was available, but careful note was taken of the

---

as it was awarded on December 4, 1980 pursuant to a motion for sanctions.

**5.** Defendants also argue that time spent on settlement negotiations not be allowed. In light of the strong public policy favoring settlement, the court considers this argument to be without merit.

**6.** Time spent by Ms. Blumin on legal research pertaining to attorneys' fees was reduced by one-half. Although the court recognizes that research and serious consideration were necessary before deciding to bring in outside counsel on that issue, in light of the fact that Mr. Saperstein was retained, the hours requested are excessive.

customary fees testified to in the affidavits submitted. Awards in similar cases were researched, although most of the reported cases are older and their rates must be adjusted for inflation. In addition, the court notes that the hourly rate for Ms. Blumin should compensate her for the patronizing manner in which she was treated by counsel for the defense because it undoubtedly made it more difficult for her to perform as an effective advocate. Finally, the court differentiated between office time and court or deposition time, "in view of the difference in the degree of effort, concentration and competence normally required," *Chapman v. Pacific Telephone and Telegraph Co.*, 456 F.Supp. 65, 77, 81 (N.D. Cal.1978).

The final calculation of the lodestar is as follows:

| | | Ms. Blumin | Mr. Dayley | Ms. O'Connor |
|---|---|---|---|---|
| **1976** | | | | |
| Office: | hours | 7.2 | 3 | |
| | rate | $60.00 | $75.00 | |
| Other: | hours | | | |
| | rate | | | |
| Total | | $432.00 | $225.00 | |
| **1977** | | | | |
| Office: | hours | 96.1 | 30.4 | |
| | rate | $65.00 | $80.00 | |
| Other: | hours | 40 | 9.4 | |
| | rate | $70.00 | $90.00 | |
| Total | | $9,047.00 | $3,278.00 | |
| **1978** | | | | |
| Office: | hours | 42.8 | 2.8 | 31.5 |
| | rate | $70.00 | $90.00 | $25.00 |
| Other: | hours | 42.4 | | |
| | | $75.00 | | |
| Total | | $6,176.00 | $252.00 | $788.00 |
| **1979** | | | | |
| Office: | hours | 1.5 | | |
| | rate | $80.00 | | |
| Other: | hours | .9 | | |
| | rate | $85.00 | | |
| Total | | $197.00 | | |
| **1980** | | | | |
| Office: | hours | 292.3 | 2.1 | 75.5 |
| | rate | $90.00 | $110.00 | $30.00 |
| Other: | hours | 30.8 | 1.2 | |
| | rate | $95.00 | $120.00 | |
| Total | | $29,233.00 | $375.00 | $2,265.00 |
| **1981** | | | | |
| Office: | hours | 131.7 | | 20.2[7] |
| | rate | $100.00 | | $70.00 |
| Other: | hours | 12.2 | | 8.5 |
| | rate | $110.00 | | $70.00 |
| Total | | $14,512.00 | | $2,009.00 |

OVERALL TOTAL: $68,789.00

7. Only one-half of the hours requested for back pay calculations were allowed, on the assumption that many of the calculations concerned pay after a possible transfer to another location.

After calculating the lodestar, it remains to determine if a multiplier is appropriate. The first factor in such a consideration is the contingent nature of success. This case was taken on a contingency fee basis. Dayley & Blumin have received no fees or costs from the plaintiffs. It should be noted that it is more difficult for a small firm like Dayley & Blumin to do contingency work than for a larger firm. In order to encourage small firms to do Title VII cases, this factor should be compensated for in choosing a multiplier.

The second factor to consider is the quality of representation where it is exceptional. The court has granted Ms. Blumin a lower hourly rate than requested because of relative lack of experience, but the results achieved were well above that expected for a new attorney. She succeeded in winning a substantial award for plaintiffs despite the determined opposition of two senior attorneys, one of whom had had substantial experience in Title VII matters and is a highly competent litigator. Although defendants claim that her inexperience was apparent in behavior such as reading questions at depositions, this court finds to the contrary. Ms. Blumin also read some of her questions during the two hearings, but this reflected her overall high level of preparedness. The questions were precisely phrased, with a strategic purpose, followed by pertinent non-read questions where necessary, and proved more effective than much off-the-cuff questioning this court has observed.

The third factor in choosing a multiplier is delay between rendition of services and the receipt of the award. The court notes that this case has been in Ms. Blumin's office since 1976. In light of this delay and the two factors discussed above, the court finds a multiplier of 2 is appropriate. One factor remains to be considered, however, and that is inflation. To compensate for that, since this court finds historic rates preferable, a total multiplier of 2.25 will be

awarded, bringing the total attorneys' fees to $154,775.00.

In addition to attorneys' fees, Dayley & Blumin have requested reimbursement for costs in the amount of $2,789.00. This includes a request for $500.50 in plane fare to attend depositions. Under Appendix A (IV)(B) of the local rules, expenses of counsel in attending depositions are not taxable as costs. *Thornberry v. Delta Air Lines*, 25 Empl.Prac.Dec. at 18,990. Therefore this item will be disallowed. Costs in the amount of $2,289.45 are granted.

The final item to be considered is attorney's fees for Mr. Saperstein. Defendants argue that there was no need for Ms. Blumin to bring in outside counsel on this issue. The court disagrees. In an effort to settle damages, defendants put Ms. Blumin in a position adverse to her clients by attempting to pool her fees with their damages. Defendants should not now be heard to complain that Ms. Blumin chose to avoid ethical improprieties by retaining Mr. Saperstein.

Defendants also submit that Mr. Saperstein's fee request is unreasonable. They cite *Farris v. Cox*, 508 F.Supp. 222, 227 n.16 (N.D.Cal.1981), for the proposition that the determination of fee awards is not an adversarial process. This contention is belied by the length of defendants own brief on the issue and their repeated assertion that the court need not award fees at all. Using the same criteria as that used in determining the plaintiffs' counsel's fees, this court finds that 107.6 hours and $125/hour [8] is a reasonable award for a total of $13,450.00. Due to Mr. Saperstein's late entry into the case, and his likelihood of success, no multiplier is appropriate.

**8.** Defendants cite *Westerlund v. Fireman's Fund Ins. Co.*, 24 Fair Empl.Prac.Cas. 1190, 1191 (N.D.Cal.1980), for the proposition that the hourly rates for fees work must be less than that for substantive representation. The court finds no indication in that case that the result there was due to anything other than consideration of the normal fees factors.