Fontaine DAVIS; Eric H. Washington; Jerilyn North, Jimmie Braden, Audrey Lee, Early Davis, Brandi Swanson, Susan Moorehead, Anne Young, Mary M. Carder, Theresa Rodigou, Kathleen J. Bradshaw, Patricia Murray, International Association of Black Firefighters–San Francisco Chapter, et al., Plaintiffs–Appellees,

v.

CITY AND COUNTY of SAN FRANCISCO, Defendant–Appellant.

No. 91–15113.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 16, 1992.

Withdrawn from Submission April 13, 1992.

Resubmitted July 1, 1992.

Decided Oct. 6, 1992.

George A. Riley, Deputy City Atty., San Francisco, Cal., for defendant-appellant.

Richard M. Pearl, San Francisco, Cal., for plaintiffs-appellees.

Before GOODWIN, FLETCHER and BRUNETTI, Circuit Judges.

FLETCHER, Circuit Judge:

On May 20, 1988, the City of San Francisco (the City) and a class of female and minority plaintiffs filed a consent decree in settlement of the plaintiffs' claims that the San Francisco Fire Department (SFFD) had long engaged in various acts of employment discrimination. The decree, which received the approval of both the district court and this Court, fully resolved the plaintiffs' challenges to the SFFD's hiring and promotional practices. It left open two questions, however, which form the basis for this appeal.

The decree stated that "[t]he issues of the costs and attorneys' fees due to counsel for the parties to this action shall be heard and resolved by the [district] Court...." The plaintiffs subsequently moved the district court for an award of fees and costs pursuant to 42 U.S.C. § 2000e–5(k) (1982). The City, while not contesting the plaintiffs' entitlement to fees, appeals the amount of fees and costs awarded as unreasonable.

The decree also left unresolved the appropriate rate of interest on an award of backpay to six firefighters whom it provided would be promoted retroactively to the position of lieutenant. The district court subsequently determined that interest was payable by the City at a floating rate equivalent to ninety percent of the prime rate for each calendar quarter in which backpay was owing. The City appeals this rate as excessive.

## I. FACTUAL BACKGROUND

The SFFD has long been subject to suits alleging discrimination in its hiring and promotion of firefighters. In 1970, when only four of the Department's eighteen hundred firefighters were black, the National Association for the Advancement of Colored People filed suit in federal district court challenging the validity of the entry-level hiring test used by the Department. After a series of rulings by the district court that the test and its subsequent modifications by the City had an adverse impact on blacks and were not job-related, *see Western Addition Community Org. v. Alioto*, 360 F.Supp. 733, 739 (N.D.Cal.1973) (*WACO III*); *Western Addition Community Org. v. Alioto*, 340 F.Supp. 1351, 1356 (N.D.Cal.1972) (*WACO II*); *Western Addition Community Org. v. Alioto*, 330 F.Supp. 536 (N.D.Cal.1971) (*WACO I*), a consent decree was entered into governing the manner in which various components of a hiring test developed by the SFFD in 1976 were to be used. *WACO V*, No. C–70–1335 WTS, slip op. at 9–10 (N.D.Cal. May 18, 1977). The decree contained no provisions for race-conscious relief and apparently did not eliminate the disparate impact of the Department's hiring procedures. *See United States v. City and County of San Francisco*, 696 F.Supp. 1287, 1293 (N.D.Cal.1988). By its terms the decree expired in 1982.

In 1980, a group of black firefighters filed a complaint with the California Department of Fair Employment and Housing, alleging that an examination instituted

by the SFFD in 1978 to determine promotions to the position of lieutenant discriminated on the basis of race in violation of California's Fair Employment and Housing Act, Cal.Gov't.Code §§ 12900 *et seq.* (West 1980). The California Fair Employment and Housing Commission determined that the examination had an adverse impact on blacks and was not job-related. The California Court of Appeals upheld this ruling but deferred any relief pending the outcome of a new round of federal litigation. *City and County of San Francisco v. Fair Employment and Housing Commission,* 191 Cal.App.3d 976, 236 Cal.Rptr. 716 (1987).

The federal litigation focused on a revised hiring test introduced by the SFFD in 1982 and a new promotional test instituted in 1984. The United States and the present appellees brought separate suits in federal district court in 1984 challenging the validity of those tests under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982), and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 6701 *et seq.* (repealed 1986). The United States sought relief for black, Asian and Hispanic applicants and firefighters, while the present appellees originally sued on behalf of female and black applicants and firefighters and ultimately came to represent Hispanic and Asian applicants and firefighters as well. While the United States challenged only the validity of the SFFD's hiring and promotional tests, the appellees added claims for racial harassment. Unlike the United States, furthermore, they sought race and gender conscious relief. The two actions were consolidated in 1986.

In October 1986, one week before trial was to commence, the City declared that it would no longer defend the validity of the SFFD's employment tests. The district court then entered summary judgment for the United States and the appellees and issued a permanent injunction prohibiting the SFFD's use of tests with an adverse impact on women or minorities where those tests could not be justified by business necessity. The injunction also required the institution of recruitment and training programs for female and minority firefighters

and the development of new employment tests by the SFFD that would conform to the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.1 *et seq.* (1991) (Uniform Guidelines). Finally, the injunction provided that all members of the SFFD enjoying a rank higher than lieutenant would be held personally responsible for the implementation of the SFFD's anti-harassment policy, and mandated the development of new procedures for hearing claims of harassment. *United States v. City and County of San Francisco,* 656 F.Supp. 276, 289–90 (N.D.Cal.1987).

The injunction did not address the present appellees' claim that the SFFD's repeated failure to develop employment tests free of disparate impact warranted race and sex conscious relief. The consent decree entered into between the appellees and the City, and opposed by the United States, resolves this issue. The decree establishes long term goals of forty percent minority and ten percent female representation in the SFFD's ranks (the SFFD did not hire its first female firefighter until August of 1987). In order to attain these goals, the decree provides that of the firefighters hired over its seven year lifespan, at least nineteen percent should be Asian, ten percent should be black, and eleven percent should be Hispanic. Altogether, fifty-five percent of the firefighters hired are to be members of a minority group, and ten percent of the firefighters hired are to be female. The decree envisions that five hundred firefighters will be hired during its lifespan.

The decree provides, furthermore, for specific recruitment efforts to attract females and members of minority groups to the SFFD. It requires that any tests utilized by the SFFD must conform to the Uniform Guidelines. And it states that any failure by the SFFD to meet the female and minority hiring goals it sets forth must be justified to the district court.

The decree also addresses the question of promotions and provides for the retroactive elevation of six named black firefighters to the rank of lieutenant, with backpay awarded from March 9, 1979, the date of

their promotion. The decree further declares that the proportion of minority and female firefighters promoted to officers' positions should come to resemble the proportion of qualified women and minorities applying for such positions. In addition to the named black firefighters, it provides for the elevation of eleven black, eight Hispanic and eight Asian firefighters to the rank of lieutenant within sixty days of the filing of the decree, and declares that twelve of an additional forty-eight individuals to be promoted should be members of minority groups. The decree establishes procedures, finally, for adjudicating claims of harassment and discrimination on the job. The district court approved the decree in an exhaustive opinion, *United States v. City and County of San Francisco*, 696 F.Supp. 1287 (N.D.Cal.1988), which was affirmed by a panel of this Court. *Davis v. City and County of San Francisco*, 890 F.2d 1438 (9th Cir.1989).

As noted above, the decree left open the issue of attorneys' fees. Subsequent to the filing of the decree, the appellees moved the district court for an award of fees pursuant to 42 U.S.C. § 2000e–5(k), which provides that in Title VII actions "the court, in its discretion, may allow the prevailing party, other than the [EEOC] or the United States, a reasonable attorney's fee...." The City did not contest the appellees' status as prevailing parties, but vigorously challenged the amount of fees they requested. It asserted that the number of hours appellees' counsel claimed to have expended on the litigation was unreasonable, that the hourly rates claimed were excessive, that certain costs claimed by the appellees including expert witness fees were not compensable, and that the appellees were not entitled to an enhancement of their fee award based on the contingent nature of the case and the high degree of success obtained.

In a thorough opinion, the district court scrutinized the fee request. It disallowed

some of the hours claimed by the appellees, but largely agreed with their contentions concerning costs and an appropriate billing rate. It enhanced appellees' fee award by a factor of two to account for the contingent nature of the compensation arrangement. The court awarded fees and costs in an amount slightly exceeding three and one half million dollars. *United States v. City and County of San Francisco*, 748 F.Supp. 1416 (N.D.Cal.1990).

The district court also determined the rate of interest to be applied to the back-pay awards of the six individuals promoted retroactively to the rank of lieutenant. Adopting the appellees' proposal, it declared that "[i]nterest shall be calculated beginning on March 9, 1979, from the end of each calendar quarter, on the amount then due and owing, at 90% of the average prime rate as obtained from the Federal Reserve Bank for the year in which the calendar quarter occurs." *United States v. City and County of San Francisco*, 747 F.Supp. 1370, 1373 (N.D.Cal.1990).

We have jurisdiction over the City's appeals from these determinations pursuant to 28 U.S.C. § 1291 (1988).

## II. ATTORNEYS' FEES

We review an award of attorneys' fees for an abuse of discretion. *Bernardi v. Yeutter*, 951 F.2d 971, 973 (9th Cir.1991); *Merritt v. Mackey*, 932 F.2d 1317, 1324 (9th Cir.1991). The district court properly recognized that the Supreme Court has adopted a two-pronged approach to the calculation of a "reasonable attorney's fee" under Title VII. A court must first calculate a "lodestar" figure by "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891 (1984); *Cunningham v. County of Los Angeles*, 879 F.2d 481, 484 (9th Cir.1988), *cert. denied*, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990).[1] While this lodestar

---

**1.** Both the Supreme Court and this court have held that the standards for determining a reasonable attorney's fee in a Title VII action pursuant to 42 U.S.C. § 2000e–5(k) are identical to those utilized in determining an attorney's fee award pursuant to 42 U.S.C. § 1988, which allows for the award of a reasonable attorney's fee to the prevailing party in actions brought

figure is presumed to represent an appropriate fee, under certain circumstances a court may adjust the award upward or downward to take into account special factors. *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548.

The City contests each step in this analysis as performed by the district court, arguing that the court allowed appellees' counsel to claim an excessive number of hours and to bill those hours at an exorbitant rate, and that it then doubled the resulting lodestar amount even though no special factors existed to justify an enhancement of the award. We consider these arguments in turn.

## A. *Reasonable Hours*

### (i) Inadequate Documentation

The City first complains that appellees' counsel failed to keep adequate records of the time spent on this litigation. The City contends that many of appellees' counsel's time sheets are vague and summary in nature, and thus did not provide the district court with an appropriate basis for making its award.

■ The district court, however, properly allowed appellees' counsel to supplement their time sheets with additional documentation of their efforts. "Basing the attorneys' fee award in part on reconstructed records developed by reference to litigation files and other records is not an abuse of discretion." *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1473 (9th Cir.1983). The district court found appellees' counsel's reconstructed records, which drew on agendas and summaries of meetings and the notes and time sheets of co-counsel, to be exten-

sive, *United States v. City and County of San Francisco,* 748 F.Supp. 1416, 1420 (N.D.Cal.1990), and we do not find it to have abused its discretion in reaching this conclusion.

The City asserts that even the reconstructed records are conclusory and uninformative, but the very example it points to in support of this contention illustrates that it seeks to impose too high a standard of documentation on fee claimants. In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court noted that "[p]laintiff's counsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures." *Id.* at 437 n. 12, 103 S.Ct. at 1941 n. 12. The example challenged by the City as an instance of poor documentation is a time record describing several hours as having been spent at a counsel's meeting that "occurred less than a month before the plaintiff's complaint was filed" and at which a host of issues were discussed in connection with the filing. Contrary to the City's characterization of this description as wholly inadequate, it conveys information sufficient to pass muster under the *Hensley* standard. Thus, the district court properly rejected the City's challenge to appellees' counsel's documentation of their hours.[2]

### (ii) Unrelated Claims

■ In calculating the lodestar amount, the district court did not include time spent by appellees' counsel on matters unrelated to the SFFD's hiring and promotional practices and the issue of racial harassment which formed the basis for its permanent

---

under 42 U.S.C. §§ 1981–1986 and Titles VI and IX of the Civil Rights Act of 1964. *See Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983) ("The standards set forth in this [§ 1988] opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.' "); *Fadhl v. City and County of San Francisco,* 859 F.2d 649, 650 n. 1 (9th Cir. 1988). Thus, we will refer to both § 1988 and § 2000e–5(k) cases in assessing the propriety of the district court's fee award here.

2. Related to the City's attack on appellees' counsel's recordkeeping is its contention that appellees' counsel claimed, and were awarded, hours exceeding those that can be accounted for by totalling their time sheets. The City has not pointed to any instances where the district court erred in its computation of the hours spent by appellees' counsel on this litigation. The district court provided a detailed attorney-by-attorney breakdown of those hours as an appendix to its opinion. *See United States v. City and County of San Francisco,* 748 F.Supp. at 1441–1443.

injunction and the subsequent consent decree. In an apparent oversight, however, the court included time spent by law clerks and legal assistants on such matters. The appellees agree with the City that the sixty-four and a half hours so spent should not have been incorporated into the calculation of the lodestar. On remand, therefore, the district court should deduct these hours in redetermining the lodestar amount.

(iii) Clerical Matters

 The City points to entries in the time sheets of William McNeill, one of appellees' attorneys, as constituting clear examples of billing abuse. Many of these entries have to do with time billed for clerical matters such as the filing of pleadings and the travel time associated therewith. Appellees' counsel are not entitled, the City argues, to attorneys' fees for the performance of such tasks.

We agree with the City. In *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), the Supreme Court noted that "purely clerical or secretarial tasks should not be billed at a paralegal [or lawyer's] rate, regardless of who performs them … '[The] dollar value [of such non-legal work] is not enhanced just because a lawyer does it.'" *Id.* at 288 n. 10, 109 S.Ct. at 2471 n. 10 (quoting *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir.1974)). It simply is not reasonable for a lawyer to bill, at her regular hourly rate, for tasks that a non-attorney employed by her could perform at a much lower cost.

The City overlooks the fact, however, that the district court took proper account of the clerical time claimed by appellees' counsel in calculating the lodestar amount. The court noted the City's contention that appellees' counsel had billed eighty-three hours for chores such as xeroxing and the serving and filing of papers. While questioning the accuracy of the City's figure, the court observed that appellees' counsel had reduced the total number of hours

claimed by five percent to account for billing errors of this sort. This five percent reduction more than compensated for the time challenged by the City as improperly billed, rendering a further reduction in the lodestar amount unnecessary. 748 F.Supp. at 1422–23.[3] Thus, while the City correctly argues that time spent on clerical matters should not have been included in the attorneys' fee award, it errs in suggesting that the district court failed to take this principle into account in its calculation of the lodestar amount.

(iv) Travel Time

 The City not only challenges the hours claimed by appellees' counsel for travelling in connection with the performance of clerical tasks, but also contends that the district court improperly allowed counsel to bill for time spent travelling to co-counsel meetings. This argument lacks merit. The touchstone in determining whether hours have been properly claimed is reasonableness. The assessment of reasonableness is made by reference to standards established in dealings between paying clients and the private bar. "[The] calculation of fees for prevailing civil rights plaintiffs is to be the same as in traditional fee arrangements and … all reasonable time spent is to be compensated." *Suzuki v. Yuen*, 678 F.2d 761, 764 (9th Cir.1982).

The district court allowed appellees' counsel to claim time spent travelling to co-counsel meetings because "counsel have submitted evidence establishing that local attorneys customarily bill their clients for travel time to co-counsel meetings." 748 F.Supp. at 1422. The City did not introduce any evidence to the contrary below, and does not point to any on appeal. Its general protestations that travel time should not be compensated for do not suffice in the face of appellees' showing concerning the accepted practice in traditional fee arrangements.

**3.** All together, appellees' counsel billed approximately nine thousand hours. The five percent billing judgment reduction thus amounted to about four hundred and fifty hours. The district court's reasoning would have been suspect if it had continually relied upon the five percent reduction to forgive errors in appellees' counsel's billing practices. This it did not do.

### (v) Time Spent on Fee Petition

■ This Court has repeatedly held that time spent by counsel in establishing the right to a fee award is compensable. *See, e.g., D'Emanuele v. Montgomery Ward & Co.,* 904 F.2d 1379, 1387–88 (9th Cir.1990); *Clark v. City of Los Angeles,* 803 F.2d 987, 992 (9th Cir.1986); *In Re Nucorp Energy, Inc.,* 764 F.2d 655, 659–660 (9th Cir.1985). In the face of this precedent, the City argues that appellees' counsel should not receive compensation for the time they spent on their fee petition because they hired an additional lawyer to act as fee counsel.

Counsel may certainly solicit the assistance of other lawyers in working on a case, however, and the time spent by all lawyers on a litigation can be billed so long as the hours claimed are not duplicative. Just recently we affirmed a fee award which included compensation for time spent by plaintiffs' regular counsel as well as special fee counsel on a fee petition. "A review of the record indicates that the request for fees and costs for work on the fee petition is reasonable. We therefore award $65,641.50 for fees incurred in litigating the fee petition: $9,370.50 for work performed by class counsel and $56,271.00 for legal services rendered by counsel employed by class counsel." *Bernardi v. Yeutter,* 951 F.2d 971, 976 (9th Cir.1991). Since the City does not claim that the time spent by appellees' counsel on the fee petition was duplicative of that claimed by fee counsel, the district court properly compensated appellees' counsel for such time.

### (vi) Duplicative Tasks and Overstaffing

■ The City contends that because a number of attorneys and paralegals billed the City for time spent on the SFFD litigation, the hours they claimed were necessarily duplicative. The district court discussed this question of overstaffing at some length. It noted that those challenging the SFFD's employment practices had been divided into five subclasses of litigants because of potential conflicts of interest. Each subclass necessarily had to be represented by a different attorney. The appellees also hired additional attorneys with special expertise in employment discrimination litigation who helped develop the overall strategy and legal analysis. The court reviewed the time records of each attorney and determined that, for the most part, the hours claimed "'reflect[] the distinct contribution of each lawyer to the case.'" 748 F.Supp. at 1421 (quoting *Johnson v. University College,* 706 F.2d 1205, 1208 (11th Cir.1983)). It disallowed a number of hours, however, which it attributed to unnecessary multiple appearances by counsel and law students at depositions and hearings.

We review for abuse of discretion. The district court's determination that the bulk of the hours claimed by appellees' counsel were reasonably expended was not an abuse of discretion. We have previously recognized that broad-based class litigation often requires the participation of multiple attorneys. "[I]n an important class action litigation such as this, the participation of more than one attorney does not constitute an unnecessary duplication of effort." *Probe v. State Teachers' Retirement System,* 780 F.2d 776, 785 (9th Cir.1986), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986); *see also Kim v. Fujikawa,* 871 F.2d 1427, 1435 n. 9 (9th Cir. 1989). Furthermore, following the lead of the Supreme Court, we have stressed that the familiarity of a district court with the underlying litigation warrants considerable deference to its findings on such matters as whether the hours claimed by prevailing counsel are redundant. *See, e.g., Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) ("We reemphasize that the district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."); *White v. City of Richmond,* 713 F.2d 458, 461 (9th Cir.1983) ("We will not assume that the attorneys' efforts were duplicative or unnecessary where the District Court employed such caution.").

The district court scrutinized the hours claimed by appellees' counsel with care.

While the City observes that district courts in other multiple representation cases have disallowed hours as redundant, that fact does not cast doubt on the court's finding here that appellees' counsel did not, for the most part, seek compensation for duplicative efforts. The City's generalized assertions that appellees' counsel billed excessive hours for time spent in co-counsel meetings similarly fall short of the mark in light of the district court's finding that appellees' counsel presented "comprehensive and persuasive" evidence, "in the form of agendas, meeting summaries and deposition testimony, of the efficient and essential nature of their co-counsel meetings." 748 F.Supp. at 1421.

(vii) Press Conferences and Public Relations

The City challenges approximately eleven hours of time billed by appellees' counsel for what it characterizes as talks given to community organizations. The district court rejected this characterization, stating that closer review demonstrated that appellees' counsel spent the eleven hours conferring with their clients and with attorneys involved in similar litigation. 748 F.Supp. at 1423 (N.D.Cal.1990). The City points to nothing in the record indicating that the district court erred in reaching this conclusion.

■■ The district court also allowed appellees' counsel compensation for time spent in giving press conferences and performing other public relations work. "Attorney work in the political arena," it stated, "where narrowly focused on fostering the litigation goals of their clients, is compensable." 748 F.Supp. at 1423. The district court derived this standard for the compensability of public relations work from the Eighth Circuit's opinion in *Jenkins v. Missouri*, 862 F.2d 677 (8th Cir. 1988), *aff'd*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

As we have previously noted, prevailing civil rights counsel are entitled to compensation for the same tasks as a private attorney. Where the giving of press conferences and performance of other lobbying and public relations work is directly and intimately related to the successful representation of a client, private attorneys do such work and bill their clients. Prevailing civil rights plaintiffs may do the same.

The district court determined that appellees' counsel's public relations work represented a valid effort to lobby the San Francisco Board of Supervisors, and that "obtaining the support of the Board of Supervisors, whose members are elected by the citizens of the City and County of San Francisco, was as vital to the consent decree as were the negotiations with the City's administrative officials." 748 F.Supp. at 1423. The district court's familiarity with the litigation and with the factors that led to the ultimate signing of the consent decree counsel deference to this determination. The City suggests, however, that at least some of the public relations activity compensated for cannot be justified according to this reasoning. It points, for example, to television appearances made by appellees' counsel after the signing of the consent decree. On remand, the district court should disallow any hours claimed by appellees' counsel for public relations work which did not contribute, directly and substantially, to the attainment of appellees' litigation goals.

B. *Reasonable Hourly Rate and Enhancement of the Lodestar*

■■ The City vigorously contests the billing rates used by the district court in arriving at its lodestar figure. Both the Supreme Court and this court have made clear that such rates should be established by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity. In *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), a unanimous Supreme Court declared that "Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization." *Id.* at 894, 104 S.Ct. at 1546. Reasonable fees are thus "to be

calculated according to the prevailing market rates in the relevant community," *id.* at 895, 104 S.Ct. at 1547, with close attention paid to the fees charged by "lawyers of reasonably comparable skill, experience, and reputation." *Id.* at 895 n. 11, 104 S.Ct. at 1547 n. 11. *See also Jordan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir. 1987) ("The prevailing market rate in the community is indicative of a reasonable hourly rate."); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210–1211 (9th Cir. 1986), *amended*, 808 F.2d 1373 (9th Cir. 1987).

■ In determining an appropriate market rate, a district court may make reference to the factors developed by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974) and approved by this Court in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). *See United Steelworkers v. Phelps Dodge Corp.*, 896 F.2d 403, 406 (9th Cir. 1990). The *Johnson–Kerr* factors include the novelty and difficulty of the issues involved in a case, the skill required to litigate those issues, the preclusion of other employment, the customary fee, relevant time constraints, the amount at stake and the results obtained, the experience, reputation, and ability of the attorneys, the nature and length of their professional relationship with the client, the "undesirability" of a case, and awards in similar suits. *United Steelworkers*, 896 F.2d at 406 n. 3.[4]

■ In determining appropriate billing rates for the appellees' attorneys, the district court discussed at some length those *Johnson–Kerr* factors which it thought relevant to this case. It observed that the case involved difficult issues concerning the validity of the SFFD's employment tests that required considerable skill to litigate, particularly given the City's " 'tena-

cious and uncompromising pretrial litigation in defense of the challenged examinations.' " 748 F.Supp. at 1426 (quoting *United States v. City and County of San Francisco*, 656 F.Supp. 276, 281 (N.D.Cal. 1987)). Representing the interests of class members during the remedial phases of the litigation was also a difficult task. "For example, it was through the efforts of counsel for plaintiff-intervenors that this court was alerted to the City's planned budget cuts which would have adversely affected the [consent] decree. As at other junctures in the litigation, counsel for plaintiff-intervenors exhibited critical legal and political skill in opposing the budget cuts." 748 F.Supp. at 1427.

The court further noted that appellees' counsel made a "massive level of commitment" to this case which precluded them from engaging in most other work during its pendency. 748 F.Supp. at 1427. Counsel worked under considerable time pressure, particularly in seeking to prevent the City from entering into a consent decree with the United States which would have strictly limited the relief available to the appellees. *Id.*

In addition, counsel obtained "excellent results" for their clients. *Id.* at 1428. While the SFFD had previously entered into consent decrees with minority groups, none involved the dramatic race and gender conscious relief embodied in the present decree. In 1985, the court noted, "minorities comprised only 14.6% of the city's firefighting force. As of August 8, 1990 minority composition stood at 24%. In a department which hired no women before 1985 there are now 36, comprising 2.6% of the force. One of the women is a lieutenant. Minority men have registered even broader gains in the officer ranks. In a fire department that had no minority members in the ranks of lieutenant or above in 1985, there are presently 54 lieutenants,

---

**4.** One other *Johnson–Kerr* factor, the time and labor required to litigate a case, pertains to the reasonableness of the hours claimed by prevailing counsel. *Blum v. Stenson*, 465 U.S. at 898, 104 S.Ct. at 1548 (1984). As we discuss below, the Supreme Court recently deemed irrelevant to the fee calculation a final *Johnson–Kerr* fac-

tor, the fixed or contingent nature of the fee. *City of Burlington v. Dague*, — U.S. —, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). The *Dague* opinion can also be read as casting doubt on the relevance of a case's "desirability" to the fee calculation. *Id.* — U.S. at — – —, 112 S.Ct. at 2641–42.

eight captains, five battalion chiefs, one assistant chief and one assistant deputy chief II." *Id.* The court also scrutinized the educational background, career history and community standing of each appellee's attorney and concluded that they possessed a "high level of experience, ability and reputation...." *Id.*

In light of these factors, the court turned to the evidence submitted by the appellees concerning the rates charged by San Francisco attorneys for work comparable to that performed in the SFFD litigation. We recently pronounced that declarations of the "prevailing market rate in the relevant community ... [are] sufficient to establish the appropriate [billing] rate for lodestar purposes." *Bouman v. Block,* 940 F.2d 1211, 1235 (9th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991). Here, the appellees produced numerous affidavits declaring that the fees sought by appellees' counsel, which incorporated 1988 rates of $110 per hour for 1985 law school graduates to $235 per hour for 1969 law school graduates, in addition to $70 per hour for paralegals, were well within the bounds of the "prevailing market rates" that form the basis for a proper fee award. *Blum* at 895, 104 S.Ct. at 1547. The district court referred to several of those affidavits in granting appellees' counsel's requested rates. It pointed to the declaration of a "prominent Title VII class action attorney" in San Francisco that attorneys at his firm with credentials similar to those of appellees' counsel would, in 1988, have billed at rates ranging from $110 per hour for 1986 law school graduates to $250 per hour for 1969 graduates, with paralegal time billed at $50 to $85 per hour. It further noted the affidavit of an attorney at McCutchen, Doyle, Brown & Enersen, a well-respected San Francisco firm, that lawyers comparable to appellees' counsel at his firm would have billed at 1988 rates ranging from $150 per hour for 1985 graduates to $230 for 1971 graduates. It referred, finally, to an affidavit indicating that a third San Francisco firm billed at essentially the same rates. 748 F.Supp. at 1430–1431.

The City did not controvert this evidence below. The only evidence it presented concerning billing rates was a survey done of the California legal market as a whole which discussed a wide variety of practice areas. As the Supreme Court made clear in *Blum,* however, the proper reference point in determining an appropriate fee award is the rates charged by private attorneys in the same legal market as prevailing counsel, San Francisco in this instance, for work similar to that performed by such counsel, broad-based complex litigation here. The City's survey was properly dismissed by the district court as shedding no light on this matter.

Before this court, the City discusses several district court decisions which, in its estimation, establish that the rates claimed by appellees' counsel for work performed in the San Francisco market were excessive. In *Bernardi v. Yeutter,* 754 F.Supp. 743 (N.D.Cal.1990), *aff'd in part and rev'd in part,* 951 F.2d 971 (9th Cir.1991), the district court deemed 1988 rates ranging from $105 per hour to $145 per hour appropriate for several San Francisco lawyers who represented the prevailing party in a sex discrimination case. One of those lawyers is also involved in this case. The court pointedly noted, however, that it did not consider "the case to have been complex litigation," 754 F.Supp. at 746, and therefore rejected evidence concerning the much higher rates which San Francisco attorneys charge for such litigation. By contrast, there is no claim here that the challenge to the SFFD's hiring and promotion policies did not amount to a complex class suit.

The City also points to the district court's decision in *Bucci v. Chromalloy,* 1989 W.L. 222441 (N.D.Cal.1989), *aff'd,* 927 F.2d 608 (9th Cir.1991) (unpublished memorandum), where fees were awarded based on rates ranging from $175 per hour for an attorney of twenty years experience to $130 per hour for an attorney of nine years experience. While those rates are somewhat lower than the ones utilized by the district court in the present case, the district court in *Bucci* characterized the proceedings before it as having been quite simple. "This

case was a straightforward discrimination action based on a flagrant pattern of abusive and insulting behavior on the part of plaintiff's supervisor. While the action vindicated significant civil rights, it did not involve complex fact patterns or novel and difficult legal questions. Indeed, plaintiff's counsel admitted in his deposition testimony that the case was not complex." *Id.* at *3. The difficulty of a case and the skill required to litigate it are two of the *Johnson–Kerr* factors which a district court may refer to in setting an appropriate billing rate. That the district court here, in what it considered to be a demanding case, utilized higher rates in calculating its fee award than did a court which viewed the case before it to have been open-and-shut does not strike us as an abuse of discretion.

The City levels several other criticisms at the billing rates approved by the district court. It argues that the district court abused its discretion in applying the same hourly rate to each task performed by appellees' counsel. We noted above our agreement with the City's position insofar as it contends that appellees' counsel were not entitled to claim fees for the performance of clerical work. However, we disagree with the City's contention that the district court erred in applying a uniform rate to the legal work performed by each appellee's attorney. Private practitioners do not generally charge varying rates for the different lawyerly tasks they undertake on a given case, and we have squarely held that the district courts can act accordingly in their calculation of fee awards. "[T]he use of a single average rate for each attorney is not necessarily an abuse of discretion." *White v. City of Richmond*, 713 F.2d 458, 461 (9th Cir.1983).

The City also contends that the district court should not have applied 1988 billing rates to each hour claimed by appellees' counsel regardless of the year in which the work was actually performed. This argument runs counter to a wealth of precedent. In *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), the Supreme Court observed that "[c]learly, compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings. We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is [entirely proper]." *Id.* at 283–84, 109 S.Ct. at 2469. We have also approved the use of current billing rates to "compensate for the delay in receiving payment. This adjustment [will] take into account lost interest and inflation." *Bouman v. Block*, 940 F.2d 1211, 1235 (9th Cir.1991) (citation omitted).

The City argues, finally, that the billing rates approved by the district court exceeded the rates charged by several of the appellees' attorneys in their private practices and therefore constituted an abuse of discretion. We rejected this argument in *White v. City of Richmond*, 713 F.2d 458 (1983). "[W]e take judicial notice of the fact that many civil rights practitioners do not bill their clients at an hourly commercial rate. While evidence of counsel's customary hourly rate may be considered by the District Court, it is not an abuse of discretion in this type of case to use the reasonable community standard that was employed here." *Id.* at 461. *Accord Maldonado v. Lehman*, 811 F.2d 1341, 1342 (9th Cir.) (quoting *White*), *cert. denied*, 484 U.S. 990, 108 S.Ct. 480, 98 L.Ed.2d 509 (1987).

One factor utilized by the district court in its rate determination, the contingent nature of the fee arrangement, requires us to remand to the district court for a redetermination of the fee. In keeping with the law of this circuit at the time it rendered its decision, the district court deemed the fact that appellees' counsel undertook this case on a contingent basis, and therefore bore the risk of nonpayment in the event of failure, to constitute a special circumstance warranting the enhancement of the lodestar fee. However, in its recent decision in *City of Burlington v. Dague*,

— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), the Supreme Court declared that the typical federal fee-shifting statutes, including 42 U.S.C. § 2000e–5(k), do not allow for upward adjustments to a lodestar fee on the basis that prevailing party's counsel incurred the risk of nonpayment.

■■■ The district court referred to the factor of contingency at two points in its fee determination. It relied on contingency to apply a multiplier to the lodestar fee; *Dague* requires the elimination of that multiplier. The district court also mentioned contingency as a consideration in listing the *Johnson–Kerr* factors which it thought relevant to establishing appropriate billing rates. 748 F.Supp. at 1427. While the *Dague* Court did not speak directly to this point, we believe that its rejection of contingency as a basis for multiplying a lodestar fee similarly dictates that contingency not be a factor in the setting of billing rates. *Dague* represents an outright rejection of contingency as a factor relevant to the establishment of a reasonable fee; it would seem to be immaterial whether the consideration of contingency occurs in deciding to apply a multiplier to the lodestar fee or in initially calculating the lodestar.

Reading the district court's remarks in context, we do not think it likely that the district court's rate determinations in computing the lodestar took into account at that point the contingent nature of appellee counsel's fee arrangements. Contingency was only one of a host of factors listed by the district court as items to be considered in its setting of billing rates, and was not a factor focused on by the court until it considered whether to apply a multiplier to the lodestar. The court's rate determinations appear to have rested on its assessment of the degree of complexity of the case and the prevailing legal fees in San Francisco for work of a like kind and quality as that performed here, and seem well supported in that regard. Nevertheless, we think it appropriate that on remand the district

court consider whether it would arrive at the same lodestar figure in this case without taking the factor of contingency into account.

## III. COSTS

### A. Expert Fees

■■■ The City challenges the district court's grant of $12,200 in expert witness fees and $69,516 in general expenses to the appellees as part of the attorneys' fee award. In contesting the award of expert fees, the City points to the Supreme Court's decision in *West Virginia University Hospitals, Inc. v. Casey*, —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), which was rendered subsequent to the district court's decision in this case. The *Casey* Court held that statutes allowing for the award of a reasonable attorneys' fee do not, by virtue of that authorization alone, provide for the compensation of expert witness expenses.[5] The Court reasoned that because Congress has frequently drafted statutes explicitly authorizing the award of both attorneys' and expert witness fees, a statute which authorizes only the grant of attorneys' fees connotes a Congressional intent that expert costs not be shifted. *Casey*, —— U.S. at —— – ——, 111 S.Ct. at 1141–43. At the time that *Casey* was decided, 42 U.S.C. § 2000e–5(k) provided only for the award of a reasonable attorney's fee in Title VII actions. It made no mention of expert witness costs. According to *Casey*, then, the appellees should not have been compensated for those costs by the district court. In the Civil Rights Act of 1991 (the Act), however, Congress rejected the notion that successful litigants should not be granted expert fees in Title VII suits. It amended § 2000e–5(k) to provide explicitly for the award of a "reasonable attorney's fee (including expert fees) as part of the costs...." Pub.L. No. 102–166, Title 1, § 113(b), 105 Stat. 1075, 1079 (1991).[6] We must decide whether Congress intended the provisions of the new Act to

---

**5.** The statute at issue in *Casey* was 42 U.S.C. § 1988.

**6.** Section 113(a) of the Act amends 42 U.S.C. § 1988 to authorize the award of expert fees in actions brought pursuant to 42 U.S.C. §§ 1981 and 1981A.

apply to pending cases so as to render the Act's express authorization of expert fee awards, rather than the *Casey* Court's determination that such awards should not be made, controlling here.

The Supreme Court has, on different occasions, set forth seemingly inconsistent presumptions regarding the applicability of new enactments to pending cases (or to litigation concerning pre-enactment events that is commenced post-enactment). In *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the Court reviewed the reversal of a district court award of attorney's fees to the prevailing plaintiffs in a school desegregation litigation. The district court had relied on its equitable powers in making the award, but the court of appeals held that statutory authorization was required and concluded that the district court lacked such authorization at the time it awarded the fees. In the period between the decisions of the district and appellate courts, however, Congress enacted legislation authorizing the award of a reasonable attorney's fee in school desegregation cases. Thus, the Supreme Court had to decide whether the court of appeals should have taken the new statute into account in reaching its decision, and in a unanimous ruling held that it should have done so. "[A] Court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016. "[E]ven where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect ... [W]e must reject the contention that a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature." *Id.* at 715, 94 S.Ct. at 2018.

In *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), the Court made what appears, at least on its face, to be a somewhat different statement concerning the effect of new enactments. The *Bowen* Court had to decide whether the Medicare Act authorizes the Secretary of Health and Human Services to engage in retroactive rulemaking. In the course of resolving this question, the Court declared, without reference to its prior statements in *Bradley*, that "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen*, 488 U.S. at 208, 109 S.Ct. at 471.

A year later, in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), the Court noted that the views articulated in *Bradley* and *Bowen* concerning the applicability in time of new enactments are in "apparent tension." *Id.* at 837, 110 S.Ct. at 1591. The *Bonjorno* Court saw no need to resolve this tension, however, in deciding whether a recently enacted statute prescribing a federal rate of postjudgment interest applied to judgments entered before its effective date. "[U]nder either [the *Bradley* or *Bonjorno*] view, where the congressional intent is clear, it governs." *Id.* The Court perceived a clear legislative intent that the postjudgment interest statute be applied only prospectively, and thus deemed it unnecessary to reconcile *Bradley* and *Bonjorno* and the precedents which those cases draw on.

We similarly do not need to choose between the *Bradley* and *Bowen* presumptions regarding retroactivity in deciding whether the Civil Rights Act of 1991 applies to pending cases. Reliance on a presumption is unnecessary, because the language of the Act reveals Congress' clear intention that the majority of the Act's provisions be applied to cases pending at the time of its passage.

Section 402(a) of the new law states that "[e]xcept as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment." By itself, this language does not determine whether the Act applies to ongoing cases, though it does give at least "some indication that [Congress] believed that application of [the Act's] provisions was urgent." *In re Reynolds*, 726 F.2d 1420, 1423 (9th

Cir.1984) (commenting on essentially identical language in the Omnibus Budget Reconciliation Act of 1981). However, two other sections of the Act reveal Congress' intent that the Act generally apply to pending litigation.

Section 109(c) of the Act states that its extension of Title VII's protections to United States citizens working for American companies overseas "shall not apply with respect to conduct occurring before the date of the enactment of this Act." Section 402(b) declares, furthermore, that "nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983."[7]

These directives from Congress that in two specific instances the Act not be applied to cases having to do with pre-Act conduct provide strong evidence of Congress' intent that the courts treat other provisions of the Act as relevant to such cases. " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)).

Indeed, if we construed the entire Act as applying only to post-passage conduct, we would run afoul of what the Supreme Court has repeatedly declared to be the " 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.' " *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 510 n. 22, 106 S.Ct. 2039, 2046 n. 22, 90 L.Ed.2d 490 (1986) (quoting *Colautti*

*v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979)); *Kungys v. United States,* 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988) (plurality opinion of Scalia, J.) (referring to "the cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant."); *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249–50, 105 S.Ct. 2587, 2594–95, 86 L.Ed.2d 168 (1985) (quoting *Colautti* ); *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section . . . .") (quoting *Montclair v. Ramsdell,* 107 (17 OHO) U.S. 147, 152, 2 S.Ct. 391, 394, 27 L.Ed. 431 (1883)); *see also Beisler v. Commissioner of Internal Revenue,* 814 F.2d 1304, 1307 (9th Cir.1987) (en banc) ("We should avoid an interpretation of a statute that renders any part of it superfluous and does not give effect to all of the words used by Congress.").

We would rob Sections 109(c) and 402(b) of all purpose were we to hold that the rest of the Act does not apply to pre-Act conduct. There would have been no need for Congress to provide that the Act does not pertain to the pre-passage activities of the Wards Cove Company, *see* Section 402(b), or of American businesses operating overseas, *see* Section 109(c), if it had not viewed the Act as otherwise applying to such conduct. Congress' express declaration that the Act is to operate only with prospective force in two instances thus provides a clear indication of its intent that the rest of the Act, including its expert fees provisions, apply to cases pending at the time of enactment and to prior conduct not barred by the applicable statutes of limitations.[8]

---

**7.** This latter provision is generally referred to as the *Wards Cove* amendment because its sole effect is to preclude the application of the Act's requirements to pending litigation involving the prevailing party in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), one of the Supreme Court decisions addressed by the new Act.

**8.** Because the statutes of limitations governing most employment discrimination claims are generally short, *see e.g.,* 42 U.S.C. § 2000e–5(e) (providing that unfair employment practice charges under Title VII must, with certain exceptions related to the processing of charges by State fair employment agencies, be filed within 180 days of the alleged occurrence), this latter category of cases is likely to be quite small.

Additional evidence of Congress' aims is provided by the introductory passages of the Act, in which Congress made no secret of its intent to reverse a number of Supreme Court decisions that it thought construed too narrowly various employment discrimination statutes. In Section 2 of the Act, Congress expressed its "finding" that "the decision of the Supreme Court in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), has weakened the scope and effectiveness of Federal civil rights protections," and in Section 3 it declared that among its purposes in passing the Act was its desire to "codify the concepts of 'business necessity' and 'job related' enunciated in ... Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)" and to "respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination."

Given Congress' sense that the Supreme Court had construed the Nation's civil rights laws so as to afford insufficient redress to those who have suffered job discrimination, it appears likely that Congress intended the courts to apply its new legislation, rather than the Court decisions which predated the Act, for the benefit of the victims of discrimination still before them. Indeed, the facts of this case indicate that to construe Congress' intent otherwise would lead to incongruous results. The district court rendered its award of expert fees at a time when it perceived Title VII as providing it with the authority to do so. The Supreme Court subsequently handed down its decision in *Casey*, the result of which was to render such an award of fees improper. Shortly thereafter, Congress passed, and the President signed into law, a statute which strips *Casey* of any force in the employment discrimination context by explicitly providing that, in actions brought pursuant to Title VII or 42 U.S.C. § 1981, expert fees may be awarded. We must now decide whether to reverse the district court's grant of such fees. It would appear inconsistent with Congress' intent for us to do so on the grounds of a Supreme Court decision predating the Act, the implications of which Congress has explicitly rejected in the employment discrimination arena.

The courts of appeals that have construed the entire Act to apply only to post-Act conduct have either ignored Sections 109(c) and 402(b) or the elementary canon of construction that we should avoid an interpretation of the Act which renders those sections superfluous. In *Vogel v. City of Cincinnati*, 959 F.2d 594 (6th Cir. 1992), the Sixth Circuit declared that neither the language nor the legislative history of the Act provide any guidance as to whether it should be applied retroactively. However, the *Vogel* court did not mention Sections 109(c) and 402(b) in reaching this conclusion. The only language that it discussed was that of Section 402(a) (providing that the Act is to take effect immediately upon enactment), which, as we noted above, is of little assistance in resolving the retroactivity issue. The Seventh Circuit, in *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225 (7th Cir.1992), similarly looked only to Section 402(a) to find the Act's text bereft of guidance.

In another opinion, the Seventh Circuit did acknowledge the existence of Sections 402(b) and 109(c), but rather than according those sections meaning simply treated them as redundant. *Mozee v. American Commercial Marine Serv. Co.*, 963 F.2d 929 (7th Cir.1992). Without pointing to any support in the text or the history of the Act for its analysis, the *Mozee* court asserted that Section 402(b) represents "nothing more than a clear assurance that courts would not apply the 1991 Act to the *Wards Cove* litigation," 963 F.2d at 933, and that Section 109(c) similarly "can be interpreted as an extra assurance that this Section's provisions will only apply to post-enactment conduct...." *Id.* The Fifth Circuit advanced a similar hypothesis in *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363 (5th Cir.1992). "Congress may have wanted to ensure that certain retroactive applications of the statute were barred without intending to reach any general conclusion about

the statute's general retroactive application." Slip op. at 5917. We decline to join the Fifth and Seventh Circuits in relegating Sections 109(c) and 402(b) to the status of mere surplusage, and in speculating as to reasons why Congress might have incorporated such surplusage into the Act. The Supreme Court has repeatedly declared that the task of discerning Congressional intent is well-served by adherence to the rule that statutes should not be construed in a manner which robs specific provisions of independent effect. We do not find it appropriate to ignore this "cardinal rule" of statutory interpretation. *Kungys,* 485 U.S. at 778, 108 S.Ct. at 1550. Where Congress intended that certain sections of the Act should not be applied retroactively, it made specific pronouncements as to those. We will not render those pronouncements a nullity by holding that the rest of the Act is likewise to have no retroactive effect.

The Eighth Circuit, in *Fray v. Omaha World Herald Co.,* 960 F.2d 1370 (8th Cir. 1992), did not completely ignore Sections 109(c) and 402(b), but did downplay their significance in light of the legislative history of the Act, which it deemed "highly probative." *Id.* at 1377. Because of the emphasis the Eighth Circuit gave to it, we too turn to that legislative history. However, we keep in mind that "[t]he starting point for interpretation of a statute 'is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Bonjorno,* 494 U.S. at 835, 110 S.Ct. at 1575 (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)); *cf. INS v. Cardoza–Fonseca,* 480 U.S. 421, 452, 107 S.Ct. 1207, 1223, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring) ("[I]f the language of a statute is clear, that language must be given effect—at least in the absence of a patent absurdity."). Further, we agree with the majority of circuits that have considered the issue that the legislative history outside the Act itself provides little indication as to Congress' intent on the subject of retroactivity.[9]

The Act lacks much in the way of a traditional legislative history. No committee or conference reports accompanied its passage. The only commentary on the Act's provisions is contained in the floor statements of various members of Congress and the interpretive memoranda which they inserted into the Congressional Record. Nothing suggests that these statements and memoranda represent the views of anyone other than the members who made or signed onto them. Thus, we agree with Senator Danforth, a principal cosponsor of the Senate Bill that was enacted into law,[10] as to the limited value of these legislative materials:

> It is very common for Members of the Senate to try to affect the way in which a court will interpret a statute by putting things into the Congressional Record. Sometimes statements are made on the floor of the Senate ... Another way to do it is to put interpretive memoranda in the Congressional Record. These memoranda typically are not read on the floor of the Senate. They are just stuck into the Record ... Last Friday, Senator Kennedy made a speech on the floor of the Senate. He stated his views of what the bill does. Senator Hatch has just made a very extensive speech on the floor. He stated his views of what the bill does. My guess, Mr. President, is that if Senator Kennedy would give us his analysis of Senator Hatch's position, he would disagree with it. If Senator Hatch would give us his analysis of Sena-

---

**9.** The Eighth Circuit is the only court of appeals to have found guidance in the Act's legislative history. *See Johnson,* 965 F.2d at 1373 ("Legislative history ... sheds little light on whether the Act should apply to pre-enactment conduct."); *Luddington,* 966 F.2d at 227 ("The floor debates on the 1991 act reveal ... divergent views on these questions [concerning retroactivity]."); *Mozee,* 963 F.2d at 934 ("A clear indica-

tion of congressional intent cannot be deciphered from the legislative history...."); *Vogel,* 959 F.2d at 598 ("The legislative history does not provide any guidance on this question [of retroactivity].").

**10.** S. 1745, 102d Cong., 1st Sess. (1991) (enacted).

tor Kennedy's position, Senator Hatch would disagree with Senator Kennedy. I might disagree with both of them. I anticipate that I am going to have an interpretive memorandum which will be put into the Record signed by the other original six Republican cosponsors for the legislation. That will be our interpretation of various provisions, but it may not be the interpretation of Senator Hatch or Senator Kennedy or anyone else ... [W]hatever is said on the floor or the Senate about a bill is the view of a Senator who is saying it ... [A] court would be well advised to take with a large grain of salt floor debate and statements placed into the Congressional Record which purport to create an interpretation for the legislation that is before us.

137 Cong.Rec. S15325 (daily ed. Oct. 29, 1991) (statement of Sen. Danforth).

Even if we were to treat the floor statements and interpretive memoranda as providing evidence of the intent of Congress as a whole, we would be able to derive little guidance from them on the subject of retroactivity. A number of members of Congress expressed the view that the Act was not meant to apply retroactively. *See, e.g.,* 137 Cong.Rec. S15472, S15478 (daily ed. Oct. 30, 1991) (interpretive memorandum submitted by Sen. Dole); 137 Cong.Rec. S15483–15485 (daily ed. Oct. 30, 1991) (statement and interpretive memorandum of Sen. Danforth); 137 Cong.Rec. 15493 (daily ed. Oct. 30, 1991) (statement of Sen. Murkowski); 137 Cong.Rec. S15953 (daily ed. Nov. 5, 1991) (interpretive memorandum submitted by Sen. Dole); 137 Cong. Rec. S15966 (daily ed. Nov. 5, 1991) (statements of Sens. Gorton, Durenberger, and Simpson). Other members expressed exactly the contrary view. *See, e.g.,* 137 Cong.Rec. S15485 (daily ed. Oct. 30, 1991) (statement of Sen. Kennedy);[11] 137 Cong. Rec. S 15963 (statement of Sen. Kennedy);

137 Cong.Rec. H9530–31 (daily ed. Nov. 7, 1991) (interpretive memorandum submitted by Rep. Edwards); 137 Cong.Rec. H9549 (daily ed. Nov. 7, 1991) (statement of Rep. Fish). Taken as a whole, the floor debates do not convey a strong sense of Congress' intent on the subject of retroactivity, and certainly do little to call into question the strong presumption that each section of the Act should be given meaning in the context of the Act read in its entirety.

In *Fray,* the Eighth Circuit placed much reliance on the fact that the 1990 version of the Civil Rights Act, which President Bush vetoed, contained express provisions for its retroactive application, while the 1991 legislation does not. "When a bill mandating retroactivity fails to pass, and a law omitting that mandate is then enacted, the legislative intent was surely that the new law be prospective only; any other conclusion simply ignores the realities of the legislative process." *Fray,* 960 F.2d at 1378.[12] However, as the Seventh Circuit noted in *Mozee,* this reasoning is suspect because it ignores other events of significance in the passage of the Act. *Mozee,* 963 F.2d at 933. The fact that the Act as passed does not contain the explicit retroactivity language of the 1990 bill appears no more probative than the fact that it omits language found in the Administration's 1991 bill which would have expressly provided for the Act's prospective application.

The Administration bill, which was introduced in the House of Representatives by House Minority Leader Michel, declared that "[t]his Act and the amendments made by this Act shall take effect upon enactment. The amendments made by this Act shall not apply to any claim arising before the effective date of this Act."[13] The bill was soundly defeated in the House, though the language providing that the Act would take effect upon enactment survived and became Section 402(a). The Administra-

---

**11.** Along with Senator Danforth, Senator Kennedy was the principal cosponsor of the Act in the Senate. Representative Edwards was a principal cosponsor of the Act in the House.

**12.** The Fifth Circuit, while appearing not to find guidance in the Act's legislative history, also

made mention of this difference between the language of the 1990 bill and the 1991 Act in its *Johnson* decision. 965 F.2d at 1373.

**13.** H.R. 1375, 102nd Cong., 1st Sess. § 15 (1991).

tion's declaration that the Act would apply only prospectively is nowhere to be found in the statute as enacted. According to the Eighth Circuit's own reasoning, then, the omission of this language creates a strong inference that Congress intended the Act to apply retroactively, one sufficient to rebut the opposite inference drawn by the Eighth Circuit from the difference in language between the 1990 and 1991 bills. *See Mozee,* 963 F.2d at 933 ("[T]he fact that Congress failed to include this explicit language in the 1991 Civil Rights Act[ ] arguably indicates that Congress intended a prospective application of the 1991 Act. However, this argument is negated by the fact that Congress did not adopt the Bush Administration's proposed bill which, in contrast, contained explicitly prospective language.").

In sum, little of value can be discerned from the legislative history of the Act. The floor debates and events leading to the passage of the Act provide conflicting signals as to whether Congress envisioned that the Act would apply to pre-passage conduct. We do not find in the legislative history evidence sufficient to overcome the weighty presumption that the Act's language, indicating as it does that Congress intended the Act to apply retroactively, is an accurate reflection of the legislative design.

Nor does the fact that the Equal Employment Opportunity Commission (EEOC) has interpreted the Act's damages provisions to apply only to claims arising after the effective date'of the Act call into question the clear import of the statutory language. The EEOC's view is expressed in a policy guidance issued soon after the Act was passed. "Policy Guidance on Application of Damages Provisions of the Civil Rights Act of 1991 to Pending Charges and Pre-Act Conduct," EEOC Notice 915.002, *reprinted in* EEOC Compl.Man. ¶ 2096 (CCH) (Dec. 27, 1991) [Guidance].[14] In the guidance, the EEOC argues that neither the language nor the legislative history of the Act provide a clear sense of Congress' intent on the subject of retroactivity. The

EEOC then discusses the *Bradley* and *Bowen* presumptions in favor of and against the retroactive application of statutes, and concludes by applying the *Bowen* presumption against retroactivity to the Act on the grounds that *Bowen* was decided subsequent to *Bradley.*

In *EEOC v. Arabian American Oil Co.,* — U.S. ——, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (ARAMCO), the Supreme Court explained that the EEOC's interpretations of Title VII are not entitled to the same deference as other agency's interpretations of the statutes which they are charged with administering:

> In *General Electric Co. v. Gilbert,* 429 U.S. 125, 140–146, 97 S.Ct. 401, 410–413, 50 L.Ed.2d 343] (1976), we addressed the proper deference to be afforded the EEOC's guidelines. Recognizing that "Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations," we held that the level of deference afforded " 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' "

*ARAMCO,* —— U.S. at ——, 111 S.Ct. at 1235 (quoting *Gilbert,* 429 U.S. at 141, 142, 97 S.Ct. at 410, 411) (in turn quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)) (parallel citations omitted); *see also Gilbert,* 429 U.S. at 141, 97 S.Ct. at 410 ("[C]ourts properly may accord less weight to [EEOC] guidelines than to administrative regulations which Congress has declared shall have the force of law, or to regulations which under the enabling statute may themselves supply the basis for imposition of liability. . . .") (citations omitted).

Here, it is doubtful whether the EEOC guidance is entitled to even this limited deference. The EEOC's interpretations of Title VII are properly considered by the courts because the EEOC bears responsibility for enforcing that statute. However,

---

**14.** The guidance deals only with the compensatory and damages provisions of the Act, but since its reasoning applies to the Act in general we address it here.

the damages provisions of the new Act, which form the subject matter of the policy guidance, do not represent amendments to Title VII, but rather add a new section to the Reconstruction-era civil rights statutes, to be codified at 42 U.S.C. § 1981A. The EEOC is not responsible for administering those statutes. Thus the guidance does not represent the interpretation of a statutory provision with respect to which the EEOC has enforcement responsibilities, and its significance is questionable in light of that fact.

In any event, we find that the guidance lacks the "power to persuade," *ARAMCO*, —— U.S. at —— 111 S.Ct. at 1235 (quoting *Skidmore*, 323 U.S. at 134, 65 S.Ct. at 161), as it too quickly concludes that resort to a presumption is necessary to resolve the question of the Act's retroactivity. The guidance notes that Sections 109(c) and 402(b) provide that in certain, limited respects, the Act is to apply only prospectively. However, it goes on to reject any "inference that the remainder of the Act has retroactive effect," asserting only that "it cannot be said that 'the[ ] language [of those sections] requires this result.'" Guidance at 2 (quoting *Bowen*, 488 U.S. at 208, 109 S.Ct. at 471) (alterations in original). The guidance does not elaborate upon this last statement, which we find to be wholly inadequate in the face of the deeply rooted principle of statutory construction that enactments should not be construed in a manner which renders certain of their provisions superfluous. Guided by the plain language of the statute and this cardinal rule of interpretation, we conclude that Congress intended the courts to apply the Civil Rights Act of 1991 to cases pending at the time of its enactment and to pre-Act conduct still open to challenge after that time. Accordingly, we affirm the

district court's award of expert witness fees in this case.[15]

## B. *Other Expenses*

 The *Casey* decision did not affect the authority of courts to compensate for expenses other than expert fees as part of an attorneys' fee award. The holding and reasoning of *Casey* were very carefully limited to the question of expert expenses. As noted above, the *Casey* Court determined that because Congress has frequently enacted laws authorizing the award of both attorneys' fees and expert witness fees, a statute authorizing only the former indicates Congress' intent that expert costs not be shifted. This reasoning does not apply to other sorts of costs that Congress is not in the habit of providing specific authorization for and which the courts have long held can be awarded as part of a reasonable attorneys' fee since they are typically charged to paying clients by private attorneys. Thus, in the wake of *Casey*, we have continued to hold that attorneys' fees awards can include reimbursement for out-of-pocket expenses including the travel, courier and copying costs that appellees' attorneys incurred here. In *Davis v. Mason County*, 927 F.2d 1473, 1487–88 (9th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991), for example, we reversed a grant of expert costs as part of an attorneys' fee award (our decision predated the 1991 Civil Rights Act) while affirming an award of travel expenses on the grounds that "expenses incurred during the course of litigation which are normally billed to fee-paying clients [are taxable] under [the attorneys' fees statutes]."

---

**15.** Concurring in *ARAMCO*, Justice Scalia questioned the majority's assertion that the EEOC's views are not entitled to the deference typically accorded administrative agencies. Pointing to the Court's decision in *EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988), Justice Scalia argued that the EEOC's interpretation of ambiguous statutory language should be deferred to as long as it is reasonable. Justice Scalia went on to state, however, that "deference is not abdication, and it requires us to accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ." *ARAMCO*, —— U.S. at ——, 111 S.Ct. at 1237 (Scalia, J., concurring). For the reasons elaborated upon above, we have concluded that the EEOC's interpretation of the Act is not reasonable as it fails to take into account the long-held rule of construction that statutory provisions should not be read to be mere surplusage.

The City contends, however, that some of the costs claimed by appellees' counsel are simply not of the sort that a private attorney would bill to a paying client, and points to items including a filing cabinet and pizza as examples. We are not at all sure that the City's assertions are accurate. In any event, on remand the district court should review the cost bill to ensure that appellees are not compensated for expenses that would not ordinarily be treated as reimbursable in a private attorney-client relationship.

## IV. INTEREST ON THE BACKPAY AWARD

The consent decree provided that six black firefighters should be retroactively promoted to the position of lieutenant, with their date of appointment set at March 9, 1979, and awarded "backpay from that date, taking into account the applicable base rates of pay for fire lieutenant and their actual regular earnings (not including overtime) plus interest since that date." *United States v. City & County of San Francisco*, 696 F.Supp. at 1314. While the City and the appellees agree on the amount of backpay that is due the six lieutenants, they dispute the interest that the lieutenants should receive on their awards. The district court, utilizing a standard it first developed in *Richardson v. Restaurant Marketing Assocs.*, 527 F.Supp. 690 (N.D.Cal.1981), determined that interest " 'shall be calculated from the end of each calendar quarter, on the amount then due and owing, at 90% of the average prime rate [as obtained from the Federal Reserve Bank] for the year in which the calendar quarter occurs.' " 747 F.Supp. at 1371 (quoting *Richardson*, 527 F.Supp. at 691).

■ The City challenges this determination on three grounds. It first argues that the district court should have utilized the rate of interest relied upon by the California Fair Employment and Housing Commission in 1982 when it held that the SFFD's promotion examination was invalid and retroactively appointed the six black firefighters in question here to the position of lieutenant. As discussed above, the California

Court of Appeals subsequently vacated this relief pending resolution of the current round of federal litigation. *City and County of San Francisco v. FEHC*, 191 Cal.App.3d 976, 236 Cal.Rptr. 716, 726–728 (1987). Nonetheless, the City argues that since, in diversity actions, "[t]he recognized general rule is that state law determines the rate of prejudgment interest," *Northrop Corp. v. Triad Int'l Marketing*, 842 F.2d 1154, 1155 (9th Cir.1988), the FEHC interest rate should be applied to the backpay award here since the lieutenants originally brought suit and were awarded relief in a state forum pursuant to state antidiscrimination law.

However, the consent decree which provides for the present award of backpay and interest constitutes the settlement of a federal action. The litigation which led to the decree was brought pursuant to two federal statutes, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982), and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 6701 *et seq.* (repealed 1986). No state law claims were presented. The district court was thus well within its bounds in applying federal law to interpret the provisions of the consent decree.

■ The City next argues that if federal law principles are to govern the calculation of interest in this case, the rate should be set by reference to 28 U.S.C. § 1961 (1982). That statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court ... Such [post-judgment] interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of judgment." While section 1961 speaks to the appropriate rate for post-judgment interest, we have held that "the same rate should be applied to pre-judgment interest 'unless the trial judge finds, on substantial evidence, that the equities of a particular case require a differ-

ent rate.'" *Ford v. Alfaro,* 785 F.2d 835, 842 (9th Cir.1986) (quoting *Western Pacific Fisheries, Inc. v. SS President Grant,* 730 F.2d 1280, 1289 (9th Cir.1984)).

In *Richardson,* which was decided in 1981, the district court deemed the adoption of a floating prime rate standard justified "in light ... of the continued increases in the rate of inflation and rapid fluctuation of the prime rate in recent years...." 527 F.Supp. at 698. The same considerations warrant a departure from the May 1988 Treasury bill rate prescribed by section 1961 here. For much of the period subsequent to March 9, 1979, the date of the lieutenant's retroactive promotion, interest rates greatly exceeded those prevalent in 1988. The late 1970's and early 1980's, in particular, were a period of very high inflation and even higher short term interest rates. To apply to the entire period that backpay was owing to the lieutenants a rate of interest that prevailed in a past period of lower inflation would not compensate them fully for their loss of use of the backpay during that time.

 The City argues, finally, that it should pay interest only on an amount equivalent to the lieutenants' backpay award as reduced by their federal income tax liability. This argument is foreclosed by the terms of the consent decree. The decree provided that the City would pay the lieutenants interest on their backpay award, not on some portion of it. The City may not use this litigation as a vehicle for modifying what it has previously agreed to do.

### CONCLUSION

We remand to the district court to redetermine its attorneys' fees award in light of the following: sixty-four and a half hours of law clerk time attributable to unrelated matters should be deducted from the lodestar; fees for public relations work should be stricken unless each item can be documented as something only a lawyer appropriately should do; billing rates previously

set should be reexamined to make sure the fact of contingent representation was not a factor in setting the rate; enhancement of the lodestar fee for contingency should be eliminated. We affirm the court's award of expert witness fees in light of our conclusion that the Civil Rights Act of 1991 applies to pending cases, but the court should reexamine the costs bill to make sure the items allowed would be of a type and in an amount that a paying client would be expected to reimburse. The court's award of interest on back pay is affirmed. In all other respects we affirm.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.